**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GENERAL LOGISTICS SYSTEMS NORTH AMERICA INC. f/k/a GLS U.S. HOLDING INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN BUTLER, REBECCA BUTLER, TODD PATRICK, and MICHAEL SALZBERG, individuals,<br><br>Defendants. | C.A. No. _____ |

## COMPLAINT

Plaintiff General Logistics Systems North America Inc., formerly known as GLS U.S. Holding Inc., sets forth the following Complaint against Brian Butler, Rebecca Butler, Todd Patrick, and Michael Salzberg.[1] The allegations in this Complaint are based on Plaintiff's knowledge of its own actions, and on information and belief as to the actions of others.

## I. NATURE OF THE ACTION

1. This is an action to recover the approximately $5.56 million windfall that Sellers received when they sold two companies, Postal Express, Inc. and TJD Delivery, Inc., to GLS based on inflated financial statements.

2. GLS and the Sellers set the initial purchase price for the Companies at a multiple

---

[1] This Complaint refers to General Logistics Systems North America Inc. f/k/a GLS U.S. Holding Inc. as "GLS" or "Plaintiff"; Brian Butler as "Butler" and Butler together with Rebecca Butler, Todd Patrick, and Michael Salzberg as the "Sellers"; Postal Express, Inc. and TJD Delivery, Inc. as "the Companies"; the Stock Purchase Agreement as the "SPA"; U.S. generally accepted accounting principles as "GAAP"; and earnings before interest, tax, depreciation, and amortization as "EBITDA."

of Postal Express's 2016 EBITDA.  Because Postal Express's financial data was used to determine the purchase price, GLS secured two contractual protections from the Sellers to guard against incorrect financial data: (i) the Sellers represented that the Companies' financial statements complied with GAAP and fairly and accurately represented the Companies' financial condition; and (ii) the SPA prescribed a process to adjust the purchase price based on the Companies' actual financial condition at closing.  When GLS took control of the Companies, it discovered that the Sellers' accounting had overstated the Companies' financial condition, inflating the purchase price.  GLS now brings this suit to recover the amount that it overpaid.

3.      On April 5, 2017, Sellers signed the SPA to sell the Companies to GLS.

4.      The initial purchase price was $12.75 million.  The parties arrived at that amount by multiplying Postal Express's 2016 EBITDA by 5.5.

5.      In the SPA, the Sellers represented and warranted that the Companies' financial statements for fiscal years 2015 and 2016 complied with GAAP.  This representation survived the closing.

6.      The SPA also contained a process for adjusting the $12.75 million initial purchase price based on the Companies' actual financial condition at closing.  For example, the purchase price would be reduced to the extent the Companies' actual net assets were less than $2.79 million—a target amount specified in the SPA.

7.      As part of the adjustment process, the SPA obligated the Sellers to prepare an Estimated Closing Statement using the same accounting principles used in Postal Express's audited 2015 financial statements, which stated that they were prepared in accordance with GAAP.  Sellers delivered their Estimated Closing Statement on April 5, 2017, and the transaction closed.

8.     After GLS took control of the Companies and gained full access to their books and records, it discovered that Postal Express's financial statements, and the Sellers' Estimated Closing Statement, did not comply with GAAP in at least three ways.  The Companies (i) treated routine maintenance and repair costs as improvements to fixed assets, and capitalized on the balance sheet these expenses rather than expensing them in the appropriate period as a deduction from earnings; (ii) overstated prepaid assets on the balance sheet; and (iii) understated expenses incurred in 2016 by recording these expenses in 2017.

9.     These GAAP deviations appeared in Postal Express's 2016 financial statements. They had the effect of lowering Postal Express's expenses, which in turn inflated Postal Express's 2016 EBITDA by a total of $518,230.  Multiplied by the 5.5x purchase-price multiple, these GAAP deviations resulted in GLS overpaying for the Companies by at least $2.85 million.

10.     The Sellers' Estimated Closing Statement also contained these GAAP deviations as well as other discrepancies that overstated the Companies' assets at closing.  On July 4, 2017, consistent with its SPA obligations, GLS delivered a Post-Closing Statement that corrected Sellers' GAAP deviations and reflected asset balances in accordance with GAAP as of the Closing Date, based on the Companies' latest post-closing financial data.  Together, Sellers' discrepancies and GAAP deviations in the Estimated Closing Statement warranted an additional $2.71 million decrease in the purchase price (beyond the $2.85 million described above).

11.     The Sellers served a Notice of Objection to GLS's Post-Closing Statement, asserting that GLS was forced to adopt the Sellers' errors because the Post-Closing Statement had to be consistent with Postal Express's prior accounting, even though it deviated from GAAP.

12.     If the parties could not reconcile their respective closing statements, the SPA required them to submit their dispute to a certified public accountant (defined in the SPA as the

"CPA Firm") to resolve.

13.     GLS requested that the parties submit their dispute to the CPA Firm, as the SPA required, but the Sellers refused.

14.     GLS notified Butler that (i) Sellers' accounting errors and discrepancies had caused GLS to overpay; and (ii) Sellers' breach of their GAAP representation in the SPA was grounds to terminate Butler's employment with Postal Express for cause (under his employment agreement).  After Butler made no effort to cure Sellers' breach or mitigate GLS's damages, Postal Express terminated his employment.

15.     On September 26, 2018, Butler sued Postal Express in Washington state court to challenge his termination.  In his now-dismissed Washington complaint, Butler conceded that Postal Express's prior accounting practices "deviat[ed] from GAAP."  Sellers therefore could not both comply with GAAP and remain consistent with Postal Express's past accounting practices. So they chose to continue Postal Express's non-GAAP accounting in breach of their GAAP representation, and with the effect of inflating the purchase price.

16.     Sellers' breach, together with the other accounting discrepancies that they refused to let a CPA resolve, gave Sellers a $5.56 million windfall—$2.85 million for the increase in the purchase price based on the inflated EBITDA and $2.71 million for the net-asset discrepancy— that GLS brings this action to recover.

## II.     PARTIES

17.     Plaintiff GLS is, and at all times relevant to this action was, a Delaware corporation with its headquarters in California.

18.     Defendant Brian Butler is, and at all times relevant to this action was, a citizen and resident of the State of Washington.  Under the SPA, the Sellers appointed Butler the Sellers' Representative "to act on behalf of [each] Seller in any litigation or arbitration or other

dispute involving" the SPA.

19.     Upon information and belief, Defendant Rebecca Butler is, and at all times

relevant to this action was, a citizen and resident of the State of Washington.

20.     Upon information and belief, Defendant Todd Patrick is, and at all times relevant

to this action was, a citizen and resident of the State of Washington.

21.     Upon information and belief, Defendant Michael Salzberg is, and at all times

relevant to this action was, a citizen and resident of the State of Washington.

22.     Each of the Defendants (i) is defined as a Seller under the SPA and (ii) signed the

SPA in his or her individual capacity as a Seller.

23.     Under Article IV of the SPA, "[e]ach of the Companies and Sellers" represented

and warranted that the statements in Article IV are "true, correct, and complete," including

representations that the Companies' financial statements (i) "fairly present in all material

respects the financial condition" of the Companies; and (ii) "have been prepared in accordance

with U.S. GAAP consistently applied on a basis consistent with past practices of the

Companies."  Ex. 2 Art. IV (preamble) and § 4.04(b).

24.     The SPA required the Sellers to indemnify GLS "jointly and severally" for "any

breach or inaccuracy of any representation or warranty" contained in Article IV of the SPA.

Ex. 2 § 7.01.

### III.     JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over this action under 28 U.S.C.

§ 1332(a)(1) because (i) complete diversity of citizenship exists; and (ii) the amount in

controversy exceeds $75,000, exclusive of interest and costs.

26.     This Court has personal jurisdiction over defendants, each of whom "irrevocably

submit[ed] to the exclusive jurisdiction of the United State District Court in Wilmington,

Delaware" for disputes arising out of the SPA.  Ex. 2 § 9.02.

27.     The United States District Court for the District of Delaware is the proper venue

under 28 U.S.C. § 1391 because GLS was incorporated in this District and the SPA specifies that

each party "irrevocably submits to the exclusive jurisdiction of the United State District Court in

Wilmington, Delaware."  Ex. 2 § 9.02.

## IV.     FACTUAL BACKGROUND

**A.     The Sellers enter the SPA with GLS and warrant that their Companies' recent financial statements comply with GAAP.**

28.     In the parties' January 13, 2017 Letter of Intent, GLS agreed to purchase from the

Sellers all stock of two Washington corporations, Postal Express, Inc. and TJD Delivery, Inc.

The parties agreed to set the initial purchase price at Postal Express's 2016 EBITDA multiplied

by 5.5, provided that the price could be adjusted if Postal Express's net asset levels were below a

specified target at closing.  A true and correct copy of the January 13, 2017 Letter of Intent is

attached as Exhibit 1.

29.     On April 5, 2017, the parties signed the SPA to document the sale.  The SPA set

the initial purchase price at $12.75 million (the "Purchase Price") based on the parties' formula

and Postal Express' reported 2016 EBITDA of approximately $2.32 million.  A true and correct

copy of the SPA is attached as Exhibit 2.

30.     Because the initial Purchase Price depended on the Companies' financial

performance, GLS bargained for—and the Sellers agreed to make—several representations and

warranties in the SPA to ensure that GLS could rely on the Companies' historical financial

statements.

31.     *First*, the SPA defines Financial Statements to include Postal Express's audited

2015 financial statements and unaudited 2016 financial statements: (i) "the reviewed

consolidated balance sheet, income statement, statement of cash flows, and statement of shareholders' equity of [Postal Express], together with the report thereon of Fleck Jurenka LLP, independent certified public accountants of [Postal Express], as and for the fiscal year ended December 31, 2015"; and (ii) "the unaudited consolidated balance sheet, income statement and statement of cash flows of [Postal Express]" as and for the fiscal year ended December 31, 2016. Ex. 2 § 4.04(a)(i).

32.     *Second*, the Sellers represented and warranted that the Financial Statements are prepared from, and are consistent with, the Companies' books and records: the Financial Statements "are derived from and are in accordance with the Books and Records and are complete in all material respects."  Ex. 2 § 4.04(b)(x).[2]

33.     *Third*, the Sellers represented and warranted that the Financial Statements "fairly and accurately present in all material respects the financial condition of the [Companies] as of the dates therein indicated and the results of operations and cash flows of the [Companies] for the periods therein specified."  Ex. 2 § 4.04(b)(y).

34.     *Fourth*, the Sellers represented and warranted that the Financial Statements (i) complied with GAAP, and (ii) applied GAAP consistently and consistent with the Companies' past practices: the Financial Statements "have been prepared in accordance with U.S. GAAP consistently applied on a basis consistent with the past practices of the Companies, and include all adjustments that are necessary for a fair presentation of the financial condition of the Companies and the results of the operations of the Companies as of the dates thereof or for the periods covered thereby."  Ex. 2 § 4.04(b)(z).

---

[2]     "Books and Records" is defined as "all books, ledgers, files, reports, plans, records, manuals and other materials . . . of, or maintained for [the Companies] or the Assets or Business."  Ex. 2 § 1.01 (Books and Records).

35.     The Sellers' representations about the Financial Statements bound them at closing and remain binding: "The representations and warranties of the Acquired Companies, Sellers, and Buyer contained in this Agreement and the certificates contemplated hereby will be deemed and construed to be continuing representations and warranties and shall survive the Closing and remain in full force and effect, regardless of any investigation or disclosure made by or on behalf of any of the Parties, until the end of the three (3) year period following the Closing Date."  Ex. 2 § 7.03.

**B.     The SPA establishes a process for adjusting the Purchase Price based on the Companies' financial condition at closing.**

36.     The initial $12.75 million Purchase Price, derived from Postal Express's 2016 EBITDA, was subject to later adjustment based on the Companies' financial condition at closing. The SPA's adjustment formula would reduce the initial $12.75 million Purchase Price by, among other things, the extent to which the Companies' Closing Adjusted Net Assets were less than $2.79 million, a target fixed in the SPA.  Ex. 2 §§ 2.01, 2.02.

1.     **Before closing, the Sellers were to prepare an Estimated Closing Statement that estimates the Companies' financial condition as of closing, while GLS was to prepare, within 90 days of closing, a Post-Closing Statement showing the Companies' actual financial condition as of closing.**

37.     To facilitate the purchase-price adjustment, the SPA required the Sellers to deliver, before closing, an Estimated Closing Statement that set forth "the Companies' good-faith estimate of," among other things, "(i) the unaudited consolidated balance sheet for the [] Companies as of . . . the Closing Date" and "the statement of income, changes in stockholders' equity and cash flows for the [] Companies" from January 1, 2016 to the Closing Date; and "(ii) the calculation of the Adjusted Net Assets"—i.e., "the difference (whether positive or

negative) between (a) Current Assets,[3] minus (b) Current Liabilities[4]"—"as of . . . the Closing Date . . . ."  Ex. 2 §§ 1.01, 2.02, 2.06.

38.　　The SPA required the Sellers to prepare their Estimated Closing Statement in accordance with a specified "Accounting Methodology," defined by reference to Postal Express's 2015 audited financial statements, which stated that they were prepared using GAAP.

39.　　The SPA defined Accounting Methodology to mean "the *same accounting methods, practices, principles, policies and procedures*, with consistent classifications, judgments and valuation and estimation methodologies that were *used in the preparation of the Reviewed Financial Statements* as if such Estimated Closing Statement was being prepared as of the end of a month."  Ex. 2 § 2.06 (emphasis added).

40.　　The Reviewed Financial Statements, in turn, are Postal Express's audited 2015 financial statements: "the reviewed consolidated balance sheet, income statement, statement of cash flows, and statement of shareholders' equity of [Postal Express], together with the report thereon of Fleck Jurenka LLP, independent certified public accountants of [Postal Express], as of and for the fiscal year ended December 31, 2015."  Ex. 2 § 4.04(a)(i).  A true and correct copy of the Reviewed Financial Statements is attached as Exhibit 3.

41.　　The Reviewed Financial Statements state in two separate places that they were

---

[3]　　Current Assets are the Companies' "trade and vendor accounts receivable, accrued income, inventory and prepaid expenses, but excluding Cash and deferred Tax assets, determined in accordance with GAAP applied using the same Accounting Methodology that was used in the preparation of the Sample Adjusted Net Assets Statement."  Ex. 2 § 1.01 (Current Assets).

[4]　　Current Liabilities are the Companies' "trade accounts payable, accrued Taxes, deferred income and accrued expenses, but excluding deferred Tax liabilities, accrued interest expense, accrued equipment capital leases, deferred rent, non-recurring liabilities (including Transaction Fees) and the current portion of long term debt, determined in accordance with GAAP applied using the same Accounting Methodology that was used in the preparation of the Sample Adjusted Net Assets Statement."  Ex. 2 § 1.01 (Current Liabilities).

prepared according to GAAP. In the "Basis of Accounting" section, Postal Express represented that its Financial Statements were "prepared in conformity with generally accepted accounting principles in the United States (GAAP)." Ex. 3 at 8. Fleck Jurenka, Postal Express's independent certified public accountant, certified that "[b]ased on our review, we are not aware of any material modification that should be made to the accompanying financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America." *Id.* at 1.

42.     The SPA's definitions specify that the Companies' Current Assets and Current Liabilities, which determine the Adjusted Net Assets on the Estimated Closing Statement, are "determined in accordance with GAAP." Ex. 2 § 1.01.

43.     No other accounting methodology or principles—or any modifications or exceptions—appear on the face of the SPA or the Reviewed Financial Statements.

44.     Within 90 days of closing, GLS was to provide a Post-Closing Statement "prepared in accordance with the Accounting Methodology and consistent with the preparation of the Estimated Closing Statement." Ex. 2 § 2.07(a). Like the Estimated Closing Statement, the Post-Closing Statement would set forth "the calculation of the Adjusted Net Assets as of . . . the Closing Date. . . ." Ex. 2 § 2.07(a).

        2.      **The parties agree to submit any disputes to a CPA for final decision.**

45.     To finalize the purchase-price adjustment, the SPA obligated GLS and Sellers to reconcile the Companies' estimated financial condition at closing with the Companies' actual condition as of closing. Ex. 2 § 2.07.

46.     Within 30 days of receiving the Post-Closing Statement, Sellers could lodge a Notice of Objection, "setting forth a specific description of the basis" of their "determination and the corresponding adjustments" they believed should be made. Ex. 2 § 2.07(b). The SPA

entitled GLS to respond to the Notice of Objection.  *Id.* § 2.07(c).

47.     If the parties were "unable to resolve all of their disagreements" over the "proposed adjustments in the Notice of Objection" within 30 days of GLS's response, the SPA required the parties to "refer any remaining disagreements to the CPA Firm," which would render a final and binding decision regarding "whether and to what extent, if any, the Statement and the Closing Adjusted Net Assets . . . required adjustment."  Ex. 2 § 2.07(c).  These adjustments would in turn determine the final adjustment to the initial $12.75 million Purchase Price.

48.     Within five days of the CPA Firm's determination, the SPA required the parties to recalculate the final Purchase Price.  To the extent the recalculated Purchase Price was less than the amount GLS paid, GLS "shall be entitled to receive an amount in cash equal" to the difference.  *Id.* § 2.07(e).  GLS had the discretion to "direct the Sellers, on a joint and several basis, to immediately pay" any amount owed to GLS as a result of the Post-Closing Purchase Price Adjustment.  *Id.* § 2.07(f).

49.     In the event of any resulting legal action, the SPA entitled the prevailing party to recover its reasonable attorneys' fees: "Costs and attorneys' fees will be borne by each Party incurring them; provided, however, that the prevailing Party will be entitled to its reasonable outside attorneys' fees and costs together with all fees and costs incurred in each Action."  Ex. 2 § 9.02.

**C.     Sellers' Financial Statements and Estimated Closing Statement deviate from GAAP, inflating Postal Express's 2016 EBITDA and, consequently, the initial Purchase Price by $2.85 million.**

50.     On April 5, 2017, Sellers delivered their Estimated Closing Statement, which incorporated data from the Companies' 2016 Financial Statements, including the "unaudited consolidated balance sheet" for the Companies for 2016.  A true and correct copy of the

Estimated Closing Statement is attached as <u>Exhibit 4</u>.

51.     The Estimated Closing Statement estimated that the Companies had Closing Adjusted Net Assets of $2,501,527.27.  Ex. 4.

52.     The transaction closed on April 5, 2017, and GLS took control of the Companies. Neither GLS's acceptance of the Estimated Closing Statement, nor the closing itself, affected GLS's "remedies under [the SPA]."  Ex. 2 § 2.06.

53.     After the closing, and with full access to the Companies' Books and Records, GLS began preparing the Post-Closing Statement, as the SPA required.  GLS discovered numerous accounting errors and discrepancies in the Estimated Closing Statement—all but one in Sellers' favor—including three GAAP deviations carried over from Postal Express's 2016 Financial Statements.

54.     ***Capitalization of Regular Expenses.***  Sellers' first deviation from GAAP involved its capitalization of regular expenses, *i.e.*, recording them as assets on the balance sheet and expensing over time rather than immediately reducing earnings within the income statement by the amount of these expenses.

55.     The Estimated Closing Statement and 2016 Financial Statements included capitalized routine repair, maintenance, and other expenses associated with the upkeep of Postal Express's fixed assets, *i.e.*, its long-term, tangible property such as buildings and equipment.

56.     Under GAAP, however, routine maintenance costs must be booked as expenses and deducted from earnings—not recorded as assets.

57.     In general, GAAP provides that "expenses and losses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services," or performing core business activities.  Statement of Financial Accounting Concepts

No. 5.

58.     An asset, on the other hand, is a "probable future economic benefit" that the entity owns or expects.  Statement of Financial Accounting Concepts No. 6.

59.     The "normal repairs and maintenance" of an asset "should not be capitalized," but must instead be treated as an expense because they do not improve the value of the asset or property.  *See* Financial Accounting Standards Board (FASB) Master Glossary; *see also* AICPA Trends & Techniques:  Balance sheet and related disclosures presented as best practices ("Expenditures for maintenance and repairs are expensed as incurred.").

60.     After reviewing Postal Express's general ledger, GLS discovered that Sellers and Postal Express had recorded routine maintenance expenses, totaling $293,206, as fixed assets on Postal Express's 2016 balance sheet.  Following proper GAAP accounting, these expenses should have been deducted from Postal Express's 2016 earnings.  Thus, this GAAP error had the effect of overstating Postal Express's assets on its balance sheet and its earnings on its income statement.

61.     ***Treatment of Prepaid Expenses.***  Sellers' second GAAP deviation concerned the treatment of prepaid expenses—*i.e.*, advance payments of future costs—as assets.

62.     Under GAAP, an entity may initially carry prepaid expenses as assets on its balance sheet, but must subtract them as expenses on its income statement over time as those assets are used.

63.     After reviewing Postal Express's books and records, GLS discovered that Postal Express had carried forward $1,146,100 in prepaid assets—some of which dated back to 2000 and had been used up.  In 2016, $136,912 of Postal Express's prepaid expenses should have been deducted from Postal Express's 2016 earnings under GAAP.

64. ***Timing of Expense Recording.*** Sellers' and Postal Express's third GAAP deviation involved recording 62 expense transactions in 2017, totaling $88,112, that Postal Express actually incurred in 2016. Under GAAP, Postal Express should have deducted these expenses from its 2016 earnings.

65. These three GAAP deviations lowered the Companies' expenses, which in turn increased their 2016 EBITDA by a total of $518,230. Multiplied by the 5.5 multiple that the parties used to determine the initial Purchase Price, the Sellers' GAAP deviations increased the Purchase Price—and caused GLS to overpay—by $2.85 million.

**D.      The Companies' actual financial condition at closing required a separate downward adjustment to the Purchase Price of approximately $2.71 million.**

66. In keeping with its obligation to prepare a Post-Closing Statement in accordance with GAAP and its contractual right to change the Estimated Closing Statement, GLS provided Sellers with a Post-Closing Statement on July 4, 2017, which corrected the GAAP deviations described above and other discrepancies in Sellers' Estimated Closing Statement based on the Companies' actual financial condition as of closing. A true and correct copy of the Post-Closing Statement is attached as Exhibit 5.

67. The discrepancies and GAAP deviations in the Sellers' Estimated Closing Statement skewed the Adjusted Net Assets in Sellers' favor. The Post-Closing Statement reported that the Companies' Closing Adjusted Net Assets were actually negative $342,179—not $2,501,527.74, as the Sellers had estimated in their Estimated Closing Statement.

68. Sellers' overstatement was due largely to carrying forward prepaid expenses as assets rather than deducting them from earnings as they were used, as GAAP required. The Estimated Closing Statement listed prepaid expenses of $1,492,388. Under GAAP accounting (*i.e.*, reducing prepaid expenses over time as the prepayments are used up), prepaid expenses

should have been $346,288—a discrepancy of $1,146,100 that should have been expensed over time to comply with GAAP.

69.     Other discrepancies in the Sellers' estimates of the Companies' Estimated Closing Adjusted Net Assets include a $528,705 overstatement of accounts receivable; a $475,803 understatement of accrued expenses; and a $266,979 understatement of wages payable. *See* Ex. 5.  The Post-Closing Statement corrected Sellers' estimates based on the Companies' actual financial condition as of closing.

70.     In total, Sellers' Estimated Closing Statement overstated the Companies' Adjusted Net Assets as of closing by $2,843,707.

71.     The necessary corrections to the Companies' Adjusted Net Assets, offset by a $135,386 correction in Sellers' favor due to differences in the Companies' post-closing cash, meant that GLS was entitled to a downward adjustment in the Purchase Price of $2,708,321.

**E.     Sellers refuse to accept the majority of changes in the Post-Closing Statement and decline to submit the parties' disputes to the CPA—as required under SPA Section 2.07(c).**

72.     On September 29, 2017, the Sellers sent GLS a Notice of Objection to the Post-Closing Statement.  The Notice of Objection primarily challenged the Post-Closing Statement's use of GAAP, which Sellers claimed was inconsistent with the Accounting Methodology.  A true and correct copy of Sellers' Notice of Objection is attached as Exhibit 6.

73.     Sellers did not contend that GLS incorrectly applied GAAP, nor did they dispute GLS's contention that the Financial Statements deviated from GAAP.  Instead, Sellers insisted that GLS was required to adopt their non-GAAP accounting.

74.     Sellers also refused to submit the parties' disputes to the CPA Firm, as the SPA required.  Sellers contended that "[t]he objections raised by Seller and the differences" between the Estimated Closing Statement and Post-Closing Statement "are not subject to CPA review

under Section 2.07(c) of the SPA." Ex. 6 at 7. Sellers insisted that the parties "litigate the issue" instead.

75.     GLS responded on January 26, 2018 that the Financial Statements and Estimated Closing Statements were not prepared in accordance with GAAP, and that Sellers had therefore breached Sections 2.06 and 4.04(b) of the SPA, causing millions in damages to GLS.

76.     GLS's letter also notified Butler that, in light of Sellers' SPA breaches, Postal Express intended to terminate his employment for cause under his April 5, 2017 employment agreement. That agreement allowed Postal Express to terminate Butler's employment for cause in the event of "a breach by you of any provision of this Agreement, the Confidentiality Agreement (as defined below) or any other contract you are a party to with the Company, the Acquirer or any of their respective affiliates." Butler did not cure or mitigate his breaches of the representations and warranties in the SPA (a contract to which he and Postal Express were both parties), so Postal Express terminated him for cause on February 25, 2018. A true and correct copy of GLS's January 26, 2018 letter is attached as Exhibit 7. A true and correct copy of Butler's employment agreement is attached as Exhibit 8.

**F.     Butler admits that Postal Express's prior financial statements contained a "deviation from GAAP."**

77.     After Postal Express terminated Butler for cause, he brought suit for wrongful termination in Washington state court on September 26, 2018. A true and correct copy of his Washington Complaint is attached as Exhibit 9.

78.     In the Washington Complaint, Butler conceded that the Sellers' Estimated Closing statement contained a "deviation from GAAP." Ex. 9 ¶ 3.13.

79.     According to Butler, the "SPA imposed two conflicting and irreconcilable contractual terms" because it required Sellers both to follow GAAP and remain consistent with

their past financial statements.  *Id.* ¶ 3.14.

80.     Butler stated that he could not do both.  His Estimated Closing Statement could not comply with GAAP because, if it did, it "would not conform to Postal Express's past accounting practices."  *Id.*  In other words, Butler readily admitted in his Washington Complaint that Sellers' past accounting practices, as reflected in the Financial Statements, did not comply with GAAP—a clear breach of Sellers' ***express representation*** that the Financial Statements "have been prepared in accordance with U.S. GAAP consistently applied on a basis consistent with past practices of the Companies."  Ex. 2 § 4.04(b)(z).

81.     Faced with this "conflict," Sellers chose to continue to breach their GAAP representation and the Accounting Methodology.  Ex. 9 ¶ 3.14.  These breaches, together with the other accounting discrepancies that Sellers refused to let a CPA Firm resolve, resulted in a $5.56 million windfall to the Sellers that GLS overpaid for the Companies.

82.     On January 25, 2019, the Washington court dismissed Butler's complaint on forum-selection grounds because Postal Express terminated him for cause based on his breaches of the SPA's representations and warranties, and the SPA required that all disputes "arising out of or relating to" the SPA be brought in a Delaware federal or state court.

### FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT, § 4.04(b)(z))

83.     GLS repeats and realleges all foregoing allegations as though fully set forth herein.

84.     The SPA is a valid and binding Contract.

85.     In the SPA, the Sellers represented and warranted that the Companies' 2015 and 2016 Financial Statements "have been prepared in accordance with U.S. GAAP consistently applied on a basis consistent with the past practices of the Companies."  Ex. 2 §4.04(b)(z).

86.     The Companies' 2015 and 2016 Financial Statements were not prepared in accordance with U.S. GAAP.  In violation of GAAP, Sellers improperly (i) capitalized routine maintenance costs, (ii) capitalized prepaid expenses without reducing the asset (or incurring the expense) as the asset was used, and (iii) recorded 2016 expenses in 2017.

87.     Therefore, the Sellers have breached their representations and warranties in the SPA.

88.     Sellers' breaches proximately damaged GLS by causing GLS to overpay for the Companies.

## SECOND CLAIM FOR RELIEF
## (BREACH OF CONTRACT, § 4.04(b)(y))

89.     GLS repeats and realleges all foregoing allegations as though fully set forth herein.

90.     The SPA is a valid and binding Contract.

91.     In the SPA, the Sellers represented and warranted that the Companies' 2015 and 2016 Financial Statements "fairly present in all material respects the financial condition of the Acquired Companies as of the dates therein indicated and the results of operations and cash flows of the Acquired Companies for the periods therein specified."  Ex. 2 § 4.04(b)(y).

92.     The Companies' 2015 and 2016 Financial Statements did not "fairly present in all material respects the financial condition of" the Companies.  Sellers improperly (i) capitalized routine maintenance costs as assets, (ii) capitalized prepaid expenses without reducing the asset (or incurring the expense) as the asset was used, and (iii) recorded 2016 expenses in 2017.

93.     Therefore, the Sellers have breached their representations and warranties in the SPA.

94.     Sellers' breaches proximately damaged GLS by causing GLS to overpay for the

Companies.

## THIRD CLAIM FOR RELIEF
## (BREACH OF CONTRACT, § 2.06)

95.    GLS repeats and realleges all foregoing allegations as though fully set forth herein.

96.    The SPA is a valid and binding Contract.

97.    The SPA required the Sellers to prepare the Estimated Closing Statement in accordance with the Accounting Methodology: "[T]he Estimated Closing Statement shall be accompanied by reasonable supporting documentation and by a certificate of a duly authorized officer of each Company that the Estimated Closing Statement was prepared, to the extent possible, using the *same accounting methods, practices, principles, policies and procedures,* with consistent classifications, judgments and valuation and estimation methodologies that were *used in the preparation of the Reviewed Financial Statements* as if such Estimated Closing Statement was being prepared as of the end of a month (the 'Accounting Methodology')." Ex. 2 § 2.06.

98.    The Reviewed Financial Statements stated that they complied with GAAP.

99.    The Estimated Closing Statement was not prepared in accordance with GAAP, as described above. Sellers improperly (i) capitalized routine maintenance costs as assets, (ii) capitalized prepaid expenses without reducing the asset (or incurring the expense) as the asset was used, and (iii) recorded 2016 expenses in 2017.

100.    Therefore, the Sellers have breached their express obligations under the SPA.

101.    The Sellers' breach proximately damaged GLS by inflating the Companies' Adjusted Net Assets, causing GLS to overpay for the Companies.

## FOURTH CLAIM FOR RELIEF
## (BREACH OF CONTRACT, § 2.07)

102.    GLS repeats and realleges all foregoing allegations as though fully set forth herein.

103.    The SPA is a valid and binding Contract.

104.    Under the SPA, if the parties could not resolve their disagreements over the Closing Adjusted Net Assets, they "shall refer any remaining disagreements to the CPA Firm which, acting as experts and not as arbitrators, shall determine, only with respect to the remaining differences so submitted, whether and to what extent, if any, the Statement and the Closing Adjusted Net Assets . . . required adjustment." Ex. 2 § 2.07(c).

105.    In their Notice of Objection, Sellers stated that "[t]he objections raised by Seller and the differences" between the Estimated Closing Statement and Post-Closing Statement "are not subject to CPA review under Section 2.07(c) of the SPA." Ex. 6 at 7.

106.    Sellers refused to submit the parties' disputes to the CPA Firm and insisted that the parties "litigate the issue" instead. Ex. 6 at 7.

107.    Therefore, Sellers breached their obligation to submit post-closing purchase price disputes to the CPA Firm.

108.    Sellers' breach proximately damaged GLS in at least two ways. First, GLS was entitled to a purchase-price reduction based on adjustments to Sellers' incorrect Closing Adjusted Net Assets that did not result from Sellers' GAAP violations. These discrepancies include overstating accounts receivable, understating accrued expenses, and understating wages payable. GLS would have been entitled to these adjustments, and others identified in its Post-Closing Statement, if Sellers had complied with their obligation to submit disputes to the CPA Firm for a final and binding determination. Second, GLS was forced to assume the expenses of

-20-

litigation that the SPA's dispute-resolution mechanism was intended to avoid.

## FIFTH CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT, BREACH OF CONTRACT § 2.07)
### (in the alternative)

109.     GLS repeats and realleges all foregoing allegations as though fully set forth herein.

110.     The SPA is a valid and binding Contract.

111.     Under the SPA, if the parties could not resolve their disagreements over the Closing Adjusted Net Assets, they "shall refer any remaining disagreements to the CPA Firm which, acting as experts and not as arbitrators, shall determine, only with respect to the remaining differences so submitted, whether and to what extent, if any, the Statement and the Closing Adjusted Net Assets . . . required adjustment." Ex. 2 § 2.07(c).

112.     In their Notice of Objection, Sellers stated that "[t]he objections raised by Seller and the differences" between the Estimated Closing Statement and Post-Closing Statement "are not subject to CPA review under Section 2.07(c) of the SPA." Ex. 6 at 7. Thus, Sellers refused to submit the parties' disputes to the CPA Firm. Ex. 6 at 7.

113.     In the alternative to its Fourth Claim for Relief, GLS seeks under 28 U.S.C. § 2201 a declaration that SPA section 2.07 requires Sellers to submit all discrepancies between their Estimated Closing Statement and the Post-Closing Statement to the CPA Firm for a final and binding determination.

## SIXTH CLAIM FOR RELIEF
### (ATTORNEYS' FEES)

114.     GLS repeats and realleges all foregoing allegations as though fully set forth herein.

115.     The SPA is a valid and binding Contract.

116.    The SPA provides, "the prevailing Party will be entitled to its reasonable outside attorneys' fees and costs together with all fees and costs incurred in each Action [arising out of or relating to this Agreement]."  Ex. 2 § 9.02.

117.    This action arises out of or relates to the SPA.

118.    GLS's claims in this case are meritorious.

119.    The SPA is governed by Delaware law.  Delaware law permits parties to agree to prevailing-party fee shifting in a contract, notwithstanding the typical "American Rule" regarding fee-shifting in litigation.

120.    Upon prevailing, GLS is entitled to recover its reasonable outside attorneys' fees and costs incurred.  Ex. 2 § 9.02.

## **PRAYER FOR RELIEF**

WHEREFORE, GLS prays for:

(a) damages in an amount to be proven at trial;

(b) or, in the alternative to the Fourth Claim for Relief, a declaration that Sellers must submit the discrepancies between their Estimated Closing Statement and the Post-Closing Statement to the CPA Firm for a final and binding arbitration;

(c) reasonable outside attorney's fees and expenses in the present matter, as an action arising out of the SPA;

(d) pre- and post-judgment interest;

(e) such other and further relief as this Court deems just and proper.

/s/ J. Peter Shindel, Jr.

OF COUNSEL:

B. Andrew Bednark*
Edward Moss*
Gerard A. Savaresse*
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
abednark@omm.com
emoss@omm.com
gsavaresse@omm.com

*pro hac vice forthcoming*

J. Peter Shindel, Jr. (#5825)
Joseph A. Sparco (#6463)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
shindel@abramsbayliss.com
sparco@abramsbayliss.com

*Attorneys for Plaintiff General Logistics Systems North America Inc.*

Dated: April 3, 2020